[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON APPLICATION FOR ORDER TO SHOW CAUSE RE ISSUANCEOF A TEMPORARY INJUNCTION AFTER HEARING
This case is before the court on the plaintiff's, Jans Construction Company, Inc., "Application for Order to Show Cause Re Issuance of a Temporary Injunction After Hearing."
On April 24, 1995, the plaintiff entered into a contract wherein it agreed to purchase and defendant agreed to sell certain property allegedly owned by defendant Blanket Meadow in the Town of Monroe. The property in question was "more specifically identified in Schedule `A', which property owned bythe seller is more particularly identified in Schedule `B' which land is also suitable for residential development into lots." (Emphasis added.)
The sole description of the real estate to be sold under the contract was in Schedule B, an A-2 survey prepared by the codefendant Stephen C. Bombero, Sr., which is entitled "Map of Property in Monroe, Conn. for Blanket Meadow Limited Partnership" CT Page 8948 and contains the notation, "Total Area = 103.927 AC ±."
Pursuant to the contract, purchase of the Blanket Meadow property was to take place in three stages. In the first stage or Part A, plaintiff was to purchase sufficient land for 10 building lots which, when combined with 22 lots on adjacent property already owned by plaintiff, would create a subdivision of 32 lots, more particularly shown on Schedule C to the contract Plaintiff was to purchase said land once approval for said subdivision was obtained and was to pay $70,000 per lot or a total of $700,000 for said property, said payment of $70,000 due at the sale of each lot. The contract required that plaintiff pay a portion of the purchase price at closing and the remainder of the monies due were secured by a purchase money mortgage on the ten lots. Blanket Meadow was to provide plaintiff with a release of said purchase money mortgage as to each lot when sold.
Part B involved the development of an additional seven lots, financed again via a purchase money mortgage and paid for by plaintiff at the price of $70,000 per lot.
After development of Part A and Part B, the contract gave plaintiff an option to purchase additional property from Blanket Meadow at the price of $70,000 per lot. As a condition for plaintiff's exercising said option and developing Part C, plaintiff had to make application for and obtain approval of a subdivision of not less than 14 lots.
Pursuant to the Contract, $50,000 was paid toward the purchase price of Part C at the closing of Part A. In addition, the Contract required that after sufficient lots in Part A were sold to pay the entire purchase price for Part A, the purchase money mortgage on Part A would remain in effect until an additional $140,000 was generated from the sale of lots in Part A to be paid to Blanket Meadow toward the purchase of the lots in Part C. Only after the additional $140,000 to be generated from the sale of lots in Part A was paid to Blanket Meadow toward the purchase of lots to be purchased in Part C would the purchase money mortgage on the remaining land in Part A be released.
The plaintiff engaged the services of Charles Spath, a licensed surveyor to prepare its application for the Part C 14 lot subdivision. Mr. Spath testified before the court that the A-2 survey of defendant Bombero indicated that 55 acres remained for Part C development; however, upon searching the title of the CT Page 8949 remaining land, he discovered that approximately 15 acres of said land (parcels 2, 3 and 6 on exhibit E) were not owned by Blanket Meadow (T. Spath). After so concluding, Spath retained the services of Kenneth Janello, an attorney at law, and the principal of a title company who searched the title confirming that the record owner of Parcel 2 is an individual named Knedlik; Parcel 3's record owner is Barnum; and Parcel 6's record owner is S. J. Development. Janello presented deeds running to these individuals and entity which are exhibits before the court. Spath testified that the remaining land would support a subdivision of no more than 11 lots thereby making it impossible for plaintiff to satisfy the condition of obtaining approval for a 14 lot subdivision.
Defendant Bombero testified for Blanket Meadow that his A-2 survey was accurate but did not produce copies of deeds running to Blanket Meadow showing record title in Blanket Meadow Similarly, Steven Maggiola, an attorney and counsel to First American Title Company, testified that First American would issue a title policy insuring all 55 acres while acknowledging that he could not find any deed or deeds into Blanket Meadow for Parcels 2, 3 and/or 6.
Defendant Blanket Meadow is obligated to convey to plaintiff by warranty deed "marketable title" to the premises contained in the A-2 survey (Contract D-3). Blanket Meadow argues that a title which is "insurable" is "marketable." Courts have traditionally defined "marketable title" as one that a reasonably prudent buyer, knowing all the facts, would be willing to accept." Powell on Real Property, Vol. 16 § 92.05(4). "The fact that a title is marketable does not necessarily mean it is insurable and, although the tender of a policy may imply marketability of title, it does not necessarily establish it as a matter of law." Powell, supra, § 92.05[2].
Plaintiff now faced with inability to perform a condition of the contract (obtaining a 14 lot subdivision for Parcel C development) seeks a mandatory injunction from the court claiming that its $50,000 down payment and its $140,000, if paid directly to Blanket Meadow, would be at risk due to its inability of performance. Therefore, it seeks injunctive relief in the form of placing said payment in an escrow account during the pendency of this action and still requiring Blanket Meadow to tender partial releases of the purchase money mortgage so as to permit sale of lots by plaintiff. CT Page 8950
"The issuance of an injunction is the exercise of an extraordinary power which rests within the sound discretion of the court." Bendell v. Johnson, 153 Conn. 48, 51 (1965). "A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law."
(Emphasis added.) Berin v. Olson, 183 Conn. 337, 340 (1981).
The first count of plaintiff's complaint claims rescission of the contract as to the third stage, which remedy if obtained would require Blanket Meadow to return all monies paid to it with respect to Parcel C. Plaintiff argues, however, that Blanket Meadow may somehow dissipate and/or shelter the money which then would not be available to satisfy a judgment. Plaintiff offered no evidence to support such a claim. "Injunctive relief may not lie where it is predicated on the fears and apprehensions of the party applying for it . . . . Although an absolute certainty is not required, it must appear that there is a substantial probability that but for the issuance of the injunction the party seeking it will suffer irreparable harm." Karls v. Alexandra,179 Conn. 390, 402 (1980).
In addition, the complaint contains counts for breach of contract, misrepresentation, fraud and mutual mistake.
The court believes that the plaintiff has not satisfied its burden of proving either irreparable harm or lack of an adequate remedy at law. To grant the injunction sought would be to reform the contract at this time when adequate remedies are available to fully compensate the plaintiff including the equitable powers of the court should the plaintiff prevail at a full and final hearing.
The application of the plaintiff for a temporary injunction is denied.
SKOLNICK, J.